# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

LINKAGE CORPORATION *vs*. TRUSTEES OF BOSTON
UNIVERSITY.

Suffolk. December 2, 1996. - May 15, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Judge. Practice, Civil,* Disqualification of judge, Summary judgment, Verdict. *Contract,* Performance and breach, Interference with contractual relations, Promissory estoppel. *Agency,* Scope of authority or employment, Ratification. *Estoppel. Damages,* Consumer protection case. *Libel and Slander. Consumer Protection Act,* Unfair or deceptive act, Trade or commerce, Businessman's claim, Damages. *Corporation,* Non-profit corporation.

In a civil action, the trial judge did not err in denying the defendant's motions seeking the judge's recusal [13]; the judge's decision to set aside a grant of partial summary judgment in favor of the defendant ordered by another judge was proper [14]; and the judge properly struck a certain trial exhibit containing cumulative or misleading information [14-15].

Evidence at the trial of a civil action supported the judge's conclusion that the defendant university was bound, on the basis of both apparent authority of a university official and ratification of the official's actions, to a renewal of a contractual agreement with the plaintiff. [15-19]

In a civil action in which the plaintiff recovered damages for breach of contract, the jury's awards of damages under theories of promissory estoppel and breach of the covenant of good faith and fair dealing were

duplicative and could not be recovered, but out-of-pocket expenses awarded on those theories that did not duplicate any other out-of-pocket expenses awarded were recoverable. [20]

A jury's award of damages on a claim of tortious interference with contractual relations was speculative where the plaintiff introduced no competent evidence on its damages. [20-21] .

On a claim for defamation, the jury's award of damages was clearly excessive and where there was no competent evidence of damages attributable to the defamation the award could not stand. [21-22]

In a civil action, the judge correctly ruled with respect to cross claims alleging violations of G. L. c. 93A that the contractual arrangements between a university and a management firm were a commercial transaction for purposes of c. 93A, and that the university, in its operation of an education center with the management firm, was in the circumstances engaged in "trade or commerce" under c. 93A. [22-27]

In a civil action the judge was warranted in finding that a university's actions in creating a pretext to justify terminating a contract with a management firm, denying the existence of a valid renewal agreement, and then hiring the firm's employees in contravention of a contractual prohibition were unfair or deceptive practices and constituted wilful and knowing violations of G. L. c. 93A, warranting the doubling of damages as well as an award of attorney's fees and costs. [27, 28-29]

The limitation on damages recoverable against charitable entities contained in G. L. c. 231, § 85K, does not apply to liability under G. L. c. 93A. [27-28]

CIVIL ACTION commenced in the Superior Court Department on July 11, 1991.

A motion for partial summary judgment was heard by *Patrick J. King*, J., and the case was tried before *Vieri Volterra*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Michael S. Gardener* (*John F. Sylvia & Susan M. Finegan* with him) for the defendants.

*Peter C. Knight* (*Hunter O'Hanian & Thomas M. Elcock* with him) for the plaintiff.

*Philip Burling* for Newbury College & others, amici curiae, submitted a brief.

GREANEY, J. This dispute arises out of an agreement between Linkage Corporation (Linkage) and Boston University that called for Linkage to create and provide educational, training, and other programs of a technical nature at a satellite facility owned by Boston University. Linkage claims that the agreement was renewed by Boston University and then

unlawfully terminated; Boston University claims that the agreement was lawfully terminated and never renewed. Linkage stated its case in the Superior Court by means of a ten-count complaint, which asserted theories of contract and tort liability and violations of G. L. c. 93A, §§ 2 (*a*) and 11. Boston University's answer contained nine counterclaims stating various theories of wrongdoing on Linkage's part and also included a claim under G. L. c. 93A. A judge in the Superior Court granted summary judgment to Boston University on some of Linkage's claims. That judge thereafter recused himself from the case at Linkage's request because, prior to his appointment to the bench, the judge had practiced law with the law firm representing Boston University. The judge next assigned to the case held pretrial conferences, after which he set aside portions of his predecessor's grant of summary judgment. A twenty-nine day jury trial ensued.[1] The jury, in response to a lengthy set of special questions, found Boston University liable for breaches of contract, defamation, wrongful interference with advantageous relations, and violations of G. L. c. 93A. The jury rejected all but one part of Boston University's counterclaims. The judge treated the jury's answers to the special questions on the G. L. c. 93A issues as advisory and subsequently made his own findings of fact and rulings of law on those issues. He also concluded that Boston University had violated G. L. c. 93A, and that Linkage had not. As provided for by G. L. c. 93A, the judge doubled portions of the damages award by the jury and awarded Linkage its attorney's fees and costs. Both before and after his decision on the G. L. c. 93A issues, the judge decided several posttrial motions, eventually allowing judgment not withstanding the verdict on some of Linkage's recovery and denying Boston University a new trial on the remainder. Both parties claimed appeals, and we granted Boston University's application for direct appellate review.

We conclude that the jury's findings that the agreement had been renewed were warranted, and the judge should not have granted Boston University judgment notwithstanding the verdict on the renewal claim. Accordingly, we reinstate the jury's finding on that claim and their award of damages. We also conclude that the jury's finding on Linkage's claim for tortious interference with advantageous business relations

[1]Some of the claims were abandoned before trial.

may not stand. We uphold the jury's finding on defamation, but vacate their award of damages. We determine that Linkage can be given all the relief it is entitled to under the jury's findings that the agreement had been renewed, and the judge's G. L. c. 93A decision. As a result, we need not deal separately with Linkage's claims for promissory estoppel, breach of the covenant of good faith and fair dealing, or breach of contract (as applicable to the original agreement between the parties) or with its tort claims, except to indicate the grounds on which we set aside the jury's finding on the tortious interference claim and their award of damages on the defamation claim.

1. *Background.* We recount at some length the facts that could have been found by the jury. Because of the jury findings in favor of Linkage, we base our recitation on the evidence and inferences most favorable to it.

Linkage was founded in 1988 by Philip Harkins to facilitate the creation of corporate training programs for companies and universities. Harkins, who had a background in both education and computer software for business systems, thought that there was a market for intensive training programs targeted at data processing professionals and software specialists and that, in partnership with a college or university, he could develop a series of educational programs and successfully launch his business.

Boston University became aware of Harkins's plans to start Linkage and expressed an interest in working with Linkage to develop training programs. Boston University had recently acquired the Wang Institute, a facility consisting of an 80,000 square foot building located on 200 acres in Tyngsborough, and had assumed the debt on the facility.[2] Harkins met with J. Joseph Meng, Boston University's vice-president for external programs, and discussed his ideas for training offerings with Meng. Meng was looking for a way to produce a revenue stream that would offset Boston University's considerable overhead on the new facility, and Linkage's programs presented a possible solution to this revenue problem.

---

[2]Boston University's acquisition of the Wang facility had been financed through a Massachusetts Health and Educational Facilities Authority (HEFA) loan, a loan with a reduced interest rate designed for tax-exempt organizations. See St. 1969, c. 454, as amended.

Together with Dennis Hart of Boston University's office of general counsel, Harkins and Meng drafted an agreement that covered the operation of Linkage's training programs at the Wang Institute (base agreement). Under the terms of the base agreement, Linkage's performance was to be measured by revenue produced, and Linkage was to receive bonuses for achieving revenue goals. The base agreement also contained a provision restricting both Linkage and Boston University from hiring each other's employees for a period of one year following the termination of the agreement.

At the time that Linkage and Boston University undertook performance of the base agreement, Meng reported to John Silber, the president of Boston University, and to Jon Westling, executive vice-president and Silber's second in command.[3] Silber reviewed the base agreement in draft form and discussed its provisions with Meng, but Meng understood that he had actual authority to negotiate and sign the agreement with Linkage.

Meng and Harkins executed the base agreement on August 1, 1988. Harkins signed on behalf of Linkage, and Meng signed on behalf of Boston University. The base agreement was limited to a term of three years, ending August 1, 1991. Under the base agreement, Linkage was to manage and market educational programs and services at the Wang facility, renamed the Boston University Corporate Education Center (BUCEC). Boston University agreed to provide over-all direction and supervision of BUCEC, and Meng was given final authority and decision-making power over the development and content of all educational activities, the recruitment and appointment of instructional personnel, and promotional activities.

Under the arrangement, Linkage initiated a variety of training programs, conferences, seminars, and other offerings for the corporate market. Boston University also transferred some university courses to BUCEC, which Linkage then managed for the university. Linkage's performance under the base agreement was highly successful: Linkage exceeded its revenue targets during each of the three years of the base agreement's operation, earning bonus payments as provided in the base agreement.

---

[3]Westling acquired the title of provost in June, 1991.

Harkins reported on a monthly basis to Meng, who reviewed every activity within BUCEC and approved Linkage's proposals for new programs. Although Linkage was responsible for managing BUCEC programs, both credit and noncredit, it did not have total financial responsibility over the operation. All income generated by BUCEC was paid directly to Boston University, and Meng was responsible for all financial reporting. BUCEC's financial office, headed by a Boston University employee, prepared a monthly accounting for Meng's review, tracking revenues and expenses and documenting how much money was owed by each organization to the other.[4]

Another division of Boston University, the Metropolitan College (MET College),[5] ran a training program, professional development seminars (PDS), under contract with another independent training and development company similar to Linkage. When the PDS contract expired at the end of June, 1989, Linkage assumed responsibility for this program. Eventually, Linkage executed a contract with Boston University to run the PDS program (MET College contract). The compensation under the MET College contract differed from Linkage's compensation under the base agreement: under the latter, Boston University received all revenues from the programs and Linkage was paid a fee with incentive bonuses, while under the MET College contract, Linkage received all revenues, paid all expenses, and remitted a 9.15 per cent royalty to Boston University. The MET College contract also provided for six months' prior notice before either party could terminate the agreement and contained a no-hire provision similar to the one in the base agreement. The MET College contract was executed on February 6, 1990. Kenneth Condon, Boston University's assistant treasurer, signed the agreement on behalf of Boston University.[6] As

---

[4]Although the base agreement did not provide which party would pay the expenses for the various programs that Linkage was to operate, Meng and Harkins orally agreed on the responsibilty for these expenses after the base agreement went into effect.

[5]Boston University's Metropolitan College (MET College) is an evening and weekend division of the university, offering both credit and noncredit courses and programs.

[6]When the MET College contract was signed, Silber was on leave of absence, and Westling was acting president. Westling had acted in Silber's

with the programs in operation under the base agreement, Meng supervised Linkage's operation of the PDS programs.

In August, 1990, Harkins and Meng began discussing renewal of the base agreement, scheduled to terminate on August 1, 1991. Harkins wanted to begin negotiations early so that, in the event the base agreement was not renewed, Linkage would have time to replace Boston University as a client. In addition to the renewal of the base agreement, Harkins and Meng negotiated the incorporation of the MET College contract into the base agreement.[7]

In March, 1991, Meng and Harkins, under the direction of Hart, agreed to fold the MET College contract into the base agreement, with the result that Linkage would no longer directly incur the expenses for or receive the revenue from the PDS program and instead would receive a fee for management.[8] Hart, as Boston University's legal counsel, also expressed concerns that regulations governing Massachusetts Health and Educational Facilities Authority (HEFA) loans (see note 2, *supra*), which prohibited reduced rate loans for profit-making institutions, might be violated by the base agreement's provision that authorized bonus payments to Linkage. Harkins and Meng took these issues into consideration as they proceeded through their negotiations toward renewal of the base agreement.

On March 5, 1991, Boston University instituted a series of changes designed to control costs (March 5 directive). Included in these changes was a requirement that any expenditure greater than $5,000 would require approval of the appropriate dean or vice-president of the university and the pro-

stead when Silber had gone on sabbatical in 1987 and served as interim president again during Silber's campaign for Governor of Massachusetts in 1990.

[7]When the MET College contract was originally negotiated, the parties had agreed that Linkage would use Boston University's bulk rate charitable postal permits. A subsequent investigation by the United States Postal Service had concluded that Boston University had improperly allowed Linkage to use its charitable institution bulk mail permits for the MET College program. The postal service concluded that Linkage operated in a commercial context and was therefore ineligible to use the permits. The parties needed to adjust the MET College contract to reflect the current postal service position.

[8]It was hoped that this arrangement would pacify the postal service and allow Linkage to continue to use Boston University's postal permits.

vost or senior vice-president. A copy of these new fiscal austerity measures was sent to Harkins and to all vice-presidents, including Meng.

Assuming that the base agreement would be renewed, Harkins and his management team prepared a business plan for the next three years, which was presented at the April meeting of Boston University's trustees in Scottsdale, Arizona. Boston University's chief financial officers attended Harkins's presentation to the trustees. Silber and Westling did not. The Linkage business plan was well received by the assembled senior Boston University officials.[9]

On April 28, 1991, following the presentation of Linkage's business plan at the trustees' meeting, Hart, Meng, and Harkins met, together with Linkage's chief financial officer and the person in charge of financial operations on the Boston University campus. At that meeting, it was agreed that the MET College contract would be folded into the renewal of the base agreement, and new compensation arrangements were reviewed. On May 21, 1991, Meng and Harkins executed an agreement, which had already gone through several revisions to address concerns expressed by Hart, terminating the MET College contract and making it part of the base agreement (May 21 agreement).[10] The language of the May 21

---

[9]At their meeting in Scottsdale, the trustees also considered a proposal for the Tyngsborough facility that involved the creation of a conference center there including a golf course. Harkins and Meng were present during a discussion of this proposed new use of BUCEC. Meng subsequently expressed to Silber his concerns that there was no real market for the golf course concept, and that its creation would be inconsistent with academic programs at BUCEC, perhaps jeopardizing HEFA financing.

[10]The relevant provisions of the May 21 agreement read as follows:

"[Boston] University and Linkage have agreed to terminate the MET College contract and to incorporate the Professional Development Seminars into the base agreement through which Linkage provides services to Boston University's Corporate Education Center. That base agreement is being revised and renewed effective July 1, 1991. . . .

"The parties hereby further agree that the MET College contract is terminated effective July 1, 1991. The parties' relationship with respect to the Professional Development Seminars will thereafter be governed by and provided for in the base contract between the par-

agreement provided that the base agreement "is being revised and renewed effective July 1, 1991."[11]

Meng promptly sent a confirmatory copy of the May 21 agreement to Westling and Condon. On May 21, 1991, Westling had a copy of the May 21 agreement, together with a copy of the renewal agreement, the terms of which, according to Meng, had been completely finalized. Westling also had a memorandum from Meng directly asking whether anything further was required to secure Boston University's approval. On May 22, Westling met with Harkins and Meng. At that meeting, Harkins reviewed the business plan and told Westling about steps Linkage had taken to expand operations. Westling questioned Harkins regarding conferences and Linkage employees, including program and instructor evaluations. Westling did not raise any concerns about the May 21 agreement or the renewal agreement at this meeting, nor did he object to the fact that Meng had executed the May 21 agreement on behalf of Boston University in apparent contravention of the March 5 directive.

On May 29, 1991, Silber's chief of staff sent a memorandum on behalf of Silber to Westling, Hart, and Condon, asking about the status of the renewal agreement.[12] Westling and Meng subsequently joined Silber in Germany. In his discussions with Meng in Europe, Silber raised no concerns about Linkage, the renewal agreement, or BUCEC.[13] Silber told Meng that he wanted additional information on Linkage. He

---

ties which otherwise governs activities at the Boston University Corporate Education Center."

[11]Although the base agreement was not scheduled to terminate until August 1, 1991, the renewal agreement was dated July 1, to correspond with the first day of Boston University's fiscal year and because the HEFA bonds had to be refinanced by June 30, 1991.

[12]Silber was on university business in Germany. The memorandum stated:

"Dr. Silber sent a message this morning from Europe that the [L]inkage contract should not be signed prior to his return on the 17th of June, if it has not already been signed. If it has been signed, Dr. Silber would like Jon Westling to bring it with him to Europe so that he and Dr. Silber may discuss it."

[13]Silber testified that he told Meng in Heidelberg that the renewal agreement was not to be signed until he was satisfied with Linkage's financial performance. Meng disputed Silber's recollection.

and Meng agreed that Harkins would repeat the presentation made by Harkins to the trustees for Silber's benefit after he returned from Europe.

On June 24, 1991, Harkins met with Silber, Westling, and Meng. Silber was rude and confrontational during this meeting, and his actions made it impossible for Harkins to present his business plan. Silber abruptly and angrily left the meeting after only twenty-five minutes.[14] Westling reassured Harkins, who was concerned by what appeared to be Silber's open hostility toward him, and told him, "Things will be all right."

After leaving the meeting, Silber ordered an unannounced internal audit of Linkage.[15] Harkins, notified of the audit by his staff on his arrival at a BUCEC conference in New Jersey, immediately returned to Massachusetts and assisted the auditors in gathering information for the audit.

Unbeknownst to Harkins or Meng, Silber had been in direct contact with various individuals associated with Linkage's operations at BUCEC. Since his return from Germany, Silber had been in contact with James Devlin, his son-in-law and a part-time instructor in some of the BUCEC programs, and Robert Daniels, a Boston University employee who had originally been hired to work on BUCEC projects by Linkage. In the period of time before and after the June 24 meeting, Daniels had extended telephone conversations with both Silber and Devlin,[16] and met personally with Silber.[17]

On July 1, Silber again met with Harkins, Meng, and

---

[14]Silber testified that his concern was his inability to assess the value added by the contractual relationship between Boston University and Linkage. According to Silber, this information was not readily apparent from the business plan.

[15]No audit of Linkage's operations had ever been done during the three years of the base agreement.

[16]These telephone conversations, some of which were over three hours long and placed in the middle of the night, took place on June 23 and 24 and were placed by Daniels from his hotel room in New Jersey where he was working on the BUCEC conference. Between June 22 and 28, Daniels spent over fifteen and one-half hours on the telephone, predominantly with Devlin.

[17]Both Devlin and Daniels had reason to encourage Silber's negative attitude towards Linkage. Devlin had been reprimanded by Harkins in 1988 and 1989 for making derogatory and racially biased statements while teaching at BUCEC. Daniels had had a series of disputes with Harkins over the manner in which his commissions were calculated. Silber also met secretly with Roy Einreinhofer, a Linkage employee, on June 30, 1991, for the

Westling. During the course of that meeting, Silber contended that he was free to hire Linkage's employees despite the express no-hire provision in the base agreement and asked which employees were the most valuable. Harkins declined to give him this information and insisted that Silber had no right to hire Linkage's employees under the base agreement. Harkins advised Silber that Linkage had turned down opportunities to work with other universities. Silber revealed that he was aware of certain complaints about Linkage. At the close of the meeting, in response to a question by Harkins, Silber told him that the May 21 agreement that Harkins had signed with Meng was ineffective.

Meng, Silber, and Harkins met for the final time on July 3, 1991.[18] At this meeting, Silber produced a preliminary audit report, which, he asserted, gave cause to terminate any agreements between the parties. Silber then demanded that Harkins sign a letter, which, in addition to other provisions, waived the no-hire provisions of the base agreement. When Harkins declined, citing his desire to consult with an attorney, Silber withdrew the first letter and handed Harkins a second letter terminating the base agreement between the parties for cause, effective immediately, based on an unfavorable audit and Linkage's failure to cooperate with the auditors. The letter also terminated the MET College contract between the parties.

Prior to the July 3 meeting, Silber had ordered Boston University security personnel and vice-presidents, including Westling, to stand by, ready for immediate action at BUCEC. After the meeting with Meng and Harkins, Silber directed this team to "secure [Boston University's] interests" and authorized them to offer increased salaries, if necessary, to Linkage employees to ensure that BUCEC operations would not be interrupted by the termination of the Linkage contract. By the time Harkins returned to Tyngsborough, Boston Univer-

purposes of obtaining information about Linkage's programs, operations, and employees.

[18]Meng notified Silber of his intent to resign from Boston University on July 1, 1991, and submitted his written resignation to Silber on July 3 before the meeting. Meng was upset about Silber's approach to Linkage and Harkins and considered Silber's conduct unreasonable and unethical. Meng's resignation resulted in severe economic ramifications for him and his family.

sity security personnel and officials had occupied BUCEC. Some of the security personnel were armed.

Boston University officials gathered Linkage employees into a room. Westling told the assembled employees that Boston University's contract with Linkage had been terminated "for cause." In response to a question by a Linkage employee, who detected an intimation of wrongdoing in the statement "for cause" and sought clarification, Westling simply repeated that the contract had been terminated "for cause."[19] Harkins then met with his employees. Harkins told his employees that he would not seek legal recourse from individual employees if they were offered and accepted employment from Boston University. Harkins indicated that he would seek such recourse from Boston University for violating the no-hire provision of the base agreement.

Boston University officials came to BUCEC with prepared letters offering employment to selected Linkage employees. While Harkins was gathering his belongings, Boston University conducted interviews with Linkage employees and hired twenty-eight of Linkage's thirty-two employees on the spot. Boston University insisted on review of all documents that Harkins was removing from the facility, refused to allow Harkins to take some of his personal papers, and made copies of everything that Harkins removed from his office.

At 11 P.M., in response to a threat by a Boston University official, Harkins called Tyngsborough police, who sent an officer to stand watch in Harkins's office. At 4:30 A.M., Harkins and his senior management left Linkage. As they left the facility, Westling swore at them and told them never to set foot on Boston University property again.

After Boston University took over operations at BUCEC, Daniels was hired to head the conference programs at BUCEC, reporting directly to the executive director, and received a raise in pay. In conversations with a Linkage employee who had been hired by Boston University, Daniels made disparaging comments about Linkage and its senior management, implying illegal activity had been the reason for the abrupt termination of the contract. Silber also made unfavorable comments about Linkage to a newspaper reporter.

---

[19]The judge found in his G. L. c. 93A decision that Westling knew when he made this statement that there was no cause for termination.

The internal audit of Linkage operations continued after the takeover. Investigations by the Boston University internal audit department and outside auditors employed by Boston University produced evidence of minor errors in Linkage's reporting of financial matters. Boston University alleged after the termination of the base agreement that a Linkage employee had made backup copies of some Linkage files and that these backup copies were missing.

After the takeover, Linkage was unable to replace Boston University as a client, due in part to its reduced staff and to the conditions surrounding the termination of its contractual relationship with Boston University. Although it has rebuilt to some extent in the time since the termination of its contract with Boston University, the company has not been able to regrow its business to the point where it was in July, 1991.

2. *Preliminary issues.* We first take up three issues raised by Boston University that, it argues, require a new trial.

(a) Boston University contends that the judge should have granted its several motions that he recuse himself. The motions stemmed from what Boston University perceived as negative comments about Silber made by the judge during settlement conferences and jury selection. The comments occurred in the give-and-take of those proceedings and generally concerned reasons why the judge did not vote for Silber in the 1990 gubernatorial campaign. In considering recusal, the judge conceded that he had been "candid" with counsel when discussing Silber's candidacy for governor, but expressed his opinion that counsel for Boston University had taken his comments out of context and had distorted them. The judge also pointed out that he had expressed admiration for Silber's considerable accomplishments at Boston University.

The judge consulted his own emotions and conscience to determine whether he lacked the capacity to act fairly and impartially, and he concluded that no disabling bias existed. See *Haddad* v. *Gonzalez,* 410 Mass. 855, 862-864 (1991), and cases cited. The judge also concluded that the case was not one in which his impartiality might reasonably be questioned. See *id.* at 862, quoting S.J.C. Rule 3:09, Canon 3 (C) (1), as appearing in 382 Mass. 811 (1981). We are satisfied that the judge did not harbor any personal bias against either Silber or Boston University, and that no other impediment existed that might require the judge to step aside.

Linkage Corporation *v.* Trustees of Boston University.

(b) Boston University contends that the judge lacked authority to set aside the grant of partial summary judgment ordered by the first judge because the judge should have recused himself. As indicated, the judge's choice to continue with the case in the face of multiple recusal motions was proper. The judge's decision to vacate the summary judgment order was also proper. A judge who is assigned a case for trial has "authority to reconsider [a] motion for summary judgment sua sponte," *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991), and "an order for partial summary judgment is . . . subject to revision at any time by the trial court prior to the entry of a judgment disposing of all claims against all parties to the action." *Acme Eng'g & Mfg. Corp.* v. *Airadyne Co.*, 9 Mass. App. Ct. 762, 764 (1980). See *Peterson* v. *Hopson*, 306 Mass. 597, 601-603 (1940). Our review of the record also indicates that partial summary judgment was not properly granted in the first place because triable issues of material fact existed on the issues eventually sent to the jury for decision.

(c) After the judge set aside the grant of partial summary judgment discussed above, Linkage and Boston University, at the judge's request, prepared a statement of facts, that, at the time, were perceived as uncontroverted. This statement was introduced in evidence at the trial as exhibit 1. Near the end of the trial, the judge allowed a motion by Linkage to strike exhibit 1 and to set aside the balance of the previous judge's order granting summary judgment.[20] The judge's action in striking the exhibit was within his discretion. In the course of a lengthy trial, the exhibit was rarely referred to by counsel for Boston University,[21] and when counsel did refer to it, the information in the exhibit was substantially duplicated by other evidence presented to the jury. Facts in the exhibit were

---

[20]At the same time, the judge, sua sponte, vacated the grant of summary judgment to Boston University on Linkage's claims for breach of the renewal agreement and breach of the implied covenant of good faith and fair dealing.

[21]We find only eight occasions during the course of the trial where the defendants' counsel made reference to exhibit 1 while questioning witnesses. Except for a brief last reference on day nineteen of the trial, defense references to exhibit 1 occurred on or before day nine of a twenty-six day trial. The exhibit was never actually given to the jury, and the portions of it that were read into the record by defense counsel comprised a minuscule part of a 5,000 page transcript.

contradicted by Linkage's evidence at trial and, because the exhibit was based on an erroneous grant of partial summary judgment, many statements in the exhibit were misleading. In our view, neither Boston University's reliance on exhibit 1, nor the timing of the plaintiff's motion to strike, substantially altered the defense of the case. Boston University's case was not prejudiced as a result of the decision to strike exhibit 1.

3. *Contract claims.* We next examine the jury's responses to a series of special questions concerning Linkage's claims for violations of pertinent agreements.[22] Our inquiry is conducted under the well-established standard that a jury verdict for a plaintiff is sound if any reasonable view of the evidence discloses any combination of circumstances from which a rational inference may be drawn in the plaintiff's favor, even if different circumstances shown by the evidence would sustain a defense verdict. See *Ferragamo* v. *Massachusetts Bay Transp. Auth.*, 395 Mass. 581, 591 (1985); *H.P. Hood & Sons* v. *Ford Motor Co.*, 370 Mass. 69, 71-72 (1976).

(a) *Renewal agreement.* The jury found that Boston University had entered into the renewal agreement with Linkage and had committed a material breach of that agreement. The jury awarded damages to Linkage, in the amount of $2,148,000 for lost profits and $330,358 for out-of-pocket damages. The judge entered judgment notwithstanding the verdict on these findings, but later partially vacated this order and reinstated the jury's award for out-of-pocket damages. We conclude that the jury's findings on this claim should be upheld in their entirety.[23]

Linkage contended that Boston University became bound to the renewal agreement on May 21, 1991, when Meng and

---

[22]The jury also made findings on several counterclaims brought by Boston University against Linkage. The jury found for Boston University only on its claim for out-of-pocket damages and awarded $74,246 to Boston University. This award is uncontested on appeal.

[23]The jury also found that Boston University had not violated the base agreement or the MET College contract. In response to a question submitted by the jury during their deliberations, the judge had instructed the jury that, if they found the renewal agreement had gone into effect before the end of an earlier contract, the latter would be superseded and should be disregarded. We need not consider whether this instruction was correct and whether Linkage is entitled to a new trial on its claims for breach of the prior contracts, because any award for breach of the prior contracts would duplicate the award for breach of the renewal agreement.

Harkins signed an agreement that (1) terminated the MET College contract effective July 1, 1991, (2) provided that the activities covered by that contract would thereafter be governed by the base agreement, and (3) stated that the "base agreement is being revised and renewed effective July 1, 1991." For Boston University to be bound by Meng's action, the jury had to find, as a fact, that Meng had either actual or apparent authority to enter into the renewal agreement, or that Boston University had acquiesced in, or failed lawfully to disavow, any unauthorized conduct by Meng, and consequently had become bound by that conduct through ratification. The judge carefully instructed the jury on the requirements for establishing a binding agreement under these theories, but the special verdict form submitted to the jury did not include an express question relating to the existence of actual authority. It is not of consequence whether the evidence would have supported a finding of actual authority because the jury found that Boston University was bound by the renewal agreement on the basis of both apparent authority and ratification. There was sufficient evidence to support both of these findings.

(i) *Apparent authority.* "Apparent or ostensible authority 'results from conduct by the principal which causes a third person reasonably to believe that a particular person . . . has authority to enter into negotiations or to make representations as his agent'. . . . If a third person goes on to change his position in reliance on this reasonable belief, the principal is estopped from denying that the agency is authorized." (Citations omitted.) *Hudson* v. *Massachusetts Prop. Ins. Underwriting Ass'n*, 386 Mass. 450, 457 (1982). We inquire whether conduct of Boston University's executives warranted a finding that Harkins reasonably believed Meng had authority to enter the renewal agreement.

The jury reasonably could have made the following findings. As Boston University's vice-president for external programs, Meng had virtual autonomy in supervising Linkage's programs at BUCEC. He negotiated and signed the base agreement on behalf of Boston University. Meng was responsible for ensuring Linkage's performance under the base agreement and the MET College contract. When Meng discussed with Silber the renewal of the base agreement in late 1990, Silber gave Meng a green light to proceed, indicat-

ing that the arrangement with Linkage had been advantageous to Boston University. Throughout negotiations with Linkage for renewal of the base agreement and the incorporation of the MET College contract therein, Meng was Boston University's primary representative.[24] In both the base agreement and the MET College contract, Meng was named the official representative of Boston University for all legal notice. It was therefore reasonable for Harkins to believe that Meng had the authority to sign the May 21 agreement, thereby binding Boston University to the termination of the MET College contract, the "fold-in" of that contract to the base agreement, and the renewal agreement.

The strongest evidence against the existence of Meng's apparent authority is the March 5 directive requiring approval by Boston University's provost or a senior vice-president for expenditures over $5,000. Harkins had received this directive. Nonetheless, the jury could have found that Boston University's conduct led Harkins to believe that the directive would not apply to the May 21 agreement or to its renewal of the base agreement. Linkage presented evidence that after the issuance of the March 5 directive, payments were authorized involving BUCEC operations without any approval as required by the directive. From his knowledge of the operations of BUCEC, and his observations of the manner in which decisions concerning Linkage's arrangements with Boston University had been reached in the past, Harkins could have reasonably concluded that the March 5 directive expressed a policy that was not always enforced, especially to programs like BUCEC that were headed by someone with direct contact to Silber. After all, it is not uncommon for an employer to issue a mandate concerning financial expenditures, and then to ignore or overlook the mandate in circumstances that suggest benign oversight because the employer's advantages are being advanced.

Based on the evidence, and their assessment of the credibility of the witnesses, the jury properly could have found that Meng had apparent authority to sign the May 21 agreement, and that the execution of that agreement bound Boston University to the renewal of the base agreement on terms that had been agreed to by Meng and Harkins.

[24]As legal counsel for Boston University, Hart assisted in the drafting of the renewal agreement to ensure that the terms agreed on by Harkins and Meng were put into proper legal form.

(ii) *Ratification.* Where an agent lacks actual authority to agree on behalf of his principal, the principal may still be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the unauthorized conduct after disclosure of material facts. "It is the instant duty of a principal, upon ascertaining the facts, at once to disaffirm an act done in his name by an agent in execution of a power conferred but in a mode not sanctioned by the terms of the agency or in excess or misuse of the authority given." *Boice-Perrine Co.* v. *Kelley*, 243 Mass. 327, 330-331 (1923). See *Irving Tanning Co.* v. *Shir*, 295 Mass. 380, 384 (1936) (ratification of agent's unauthorized acts inferred where, after knowledge, principal made no effort to repudiate them). Ratification relates back, and has the same effect, as a prior grant of authority by the principal to the agent. See *Canton* v. *Bruno*, 361 Mass. 598, 607 n.8 (1972); *White* v. *Apsley Rubber Co.*, 194 Mass. 97, 100 (1907).

The jury could have found that any deficiency in Meng's authority to execute the May 21 agreement was obviated by subsequent conduct of Boston University officials, especially Westling in his capacity as provost and executive vice-president, whose approval was ostensibly required by the March 5 directive. Meng sent copies of the May 21 agreement to Condon and Westling immediately on its execution. The draft of the renewal agreement was attached to the May 21 agreement, as was a memorandum from Meng explaining the renewal agreement and explicitly asking whether any further review was needed to secure approval. Harkins and Meng met with Westling on May 22 so that Harkins could present his business plan. Westling did not raise any objections to the renewal agreement, nor did he indicate that the agreement required further approval from him or others before it could take effect. Condon never responded to Meng's query as to whether any further action would be needed. Silber also failed to repudiate Meng's action on behalf of the university. When he met with Meng in Europe in late May, Silber told Meng only that he wanted to "get up to speed" on the Linkage operation, and Silber expressed no objection to the agreement or that Meng had been unauthorized to enter into it without any further approval. Thus, neither Silber nor Westling raised any question about the validity of the renewal agreement until the meeting on July 1, when Silber finally told Harkins

and Meng that, in Silber's opinion, Boston University was not bound by the renewal agreement.

Based on this sequence of events, the jury reasonably could have found that ratification of Meng's execution of the May 21 agreement by Boston University followed from the informed acquiescence of Westling, Silber, and other Boston University officials, and from their failure promptly to disavow Meng's conduct after learning material facts.

There is an additional factor supporting the jury's decision: Boston University clearly benefited from the provisions in the May 21 agreement that folded the MET College contract into the base agreement. "It is settled that one cannot accept the benefits of a transaction purporting to be done in his behalf and afterwards repudiate it." *Shoolman* v. *Wales Mfg. Co.*, 331 Mass. 211, 216 (1954), quoting *Calkins* v. *Wire Hardware Co.*, 267 Mass. 52, 68 (1929). By incorporating the MET College contract into the base agreement, Boston University eliminated the six-month notice for termination in the MET College contract, and the agreement helped to resolve existing problems with the use of the nonprofit postage permit and potential problems with the HEFA financing incurred in connection with the university's acquisition of the BUCEC site. The jury reasonably could have found Harkins credible when he testified that Linkage agreed to terminate the separate MET College contract only as part of a larger arrangement by which the base agreement was to be renewed.[25] After the May 21 agreement was executed, the "fold-in" provisions were implemented and the terms of the base agreement were followed for both programs. Boston University's acceptance of the benefits of the May 21 agreement thus furnished a separate, and important, indication of its acquiescence to, and ratification of, the renewal agreement. See *Kidder* v. *Green-man*, 283 Mass. 601, 616 (1933); *Maloon* v. *Barrett*, 192 Mass. 552, 555 (1906).

---

[25]If it had not been terminated by the May 21 agreement, the MET College contract would not have expired until June, 1993. The jury could have inferred that it would have been illogical for Harkins to have executed the May 21 agreement except in connection with a renewal of the base agreement and that Boston University clearly benefited from the "fold-in" provision.

(b) *"Promissory estoppel."*[26] The jury also found that Link-age had reasonably relied to its detriment on Boston University's promise to enter into the renewal agreement and awarded lost profits in the amount of $787,239 and out-of-pocket damages of $7,740 to Linkage. The judge entered judgment notwithstanding the verdict on this claim, but later vacated this order and reinstated the jury's findings. Because we conclude that an award for lost profits on this claim would duplicate the award for the breach of the renewal agreement, as the two claims involve alternative legal theories of recovery,[27] we need not ad-dress the merits of Linkage's promissory estoppel claim. We shall, however, let the jury's small award of $7,740 for out-of-pocket damages on this claim stand. It is obvious that this award covers expenses incurred by Linkage in start-up costs for a planned Chicago office and does not duplicate any other out-of-pocket expenses awarded to Linkage. Despite the jury's placement of the sum on the verdict form, Linkage is entitled to these damages.

(c) *Breach of the covenant of good faith and fair dealing.* The jury also found that Boston University had committed a breach of the covenant of good faith and fair dealing owed to Linkage and awarded $250,000 in damages. The judge entered judgment notwithstanding the verdict on this claim. The jury's finding that the covenant had been violated is supported by the evidence, but the damages awarded are duplicative of the dam-ages for breach of the renewal agreement and cannot be recovered.

4. *Tort claims.* The jury returned findings that Boston University had tortiously interfered with Linkage's advanta-geous business relations and had defamed Linkage.

(a) *Tortious interference.* The jury's finding on this claim stemmed from the evidence that Boston University had hired twenty-eight of Linkage's employees. The jury awarded dam-

---

[26]This claim was argued by the parties and presented to the jury as a claim for "promissory estoppel," even though "[w]e do not use the expression 'promissory estoppel,' since it tends to confusion rather than clarity." *Loranger Constr. Corp.* v. *E.F. Hauserman Co.*, 376 Mass. 757, 761 (1978).

[27]The judge had so informed the jury, and had instructed them to enter the same amount for this "promissory estoppel" claim as for the renewal agree-ment claim. The jury, however, awarded a lesser amount for the former than for the latter. Linkage argues that the award may have represented "the value of Linkage's goodwill," but we can discern no basis for a conclusion by the jury that would support such an award.

ages of $280,000. There is no question that the evidence warranted a finding that Boston University had violated the no-hire provisions of the agreements and thus would be liable for breach of contract. The jury, however, did not consider this theory, but rather dealt only with the tort claim. We have grave doubts that, if considered on the merits, the jury's tortious interference finding could stand. We need not, however, deal with the claim under either a tort or contract theory because Linkage provided no evidence of damages. The jury were instructed that the "measure of damages . . . for the loss of [Linkage's] employees caused by the alleged wrongful actions of [Boston University] is the cost of training replacements for those employees." This instruction was correct. See *Augat, Inc.* v. *Aegis, Inc.*, 417 Mass. 484, 485 (1994). Linkage introduced evidence that its employees were valuable assets and that it could not operate without them, but it introduced no competent evidence as to the cost of hiring and training replacement employees. The jury's award of $280,000 in damages is speculative and must be set aside.[28]

(b) *Defamation.* The jury found that Boston University officers and employees had defamed Linkage and its principals and awarded damages of $1,060,641.01. We conclude that, while there was sufficient evidence to support a finding of defamation, the award was clearly excessive and probably punitive.[29] We set aside the entire award. The evidence that supported the jury's finding of defamation likewise supported the judge's conclusion that defamation constituted an unfair and deceptive practice in violation of G. L. c. 93A.[30] However, any award for defamation must be based on damages suffered

---

[28]The damages are also not supportable on any theory that Linkage may have lost profits during the period required to replace the employees because Linkage is receiving its lost profits for the three years of the renewal agreement.

[29]The judge instructed the jury on the legal requirements for finding defamation, but he failed to give any instructions on how damages should be calculated.

[30]The jury would have been warranted in finding that statements made by Daniels to a Linkage employee were defamatory because the statements accused Harkins and his brother of criminal conduct. The statements were made in a private conversation and would not support any measurable damages. Also, the jury would have been warranted in finding that Westling's statements to Linkage employees on the day of the termination, that the termination was "for cause," were defamatory when considered in the context of the hostile and forcible takeover of Linkage's offices, because

by Linkage because of the defamatory remarks. The remarks were, as the judge observed, made to Linkage employees in an effort to "sow[] the seeds of discord" and undermine their loyalty to Linkage. We think the only injury sustained by Linkage that could properly be attributed to the defamation is the cost of replacing the employees whose decision to leave Linkage's employ might have been influenced by the remarks. As has been discussed, there is no evidence of such damages. Linkage has otherwise been made whole for its lost profits, and there is no other basis to sustain an award of defamation damages, much less an award of the magnitude returned by the jury.

5. *General Laws c. 93A.* The judge entered his own decision on the G. L. c. 93A claims, treating the jury's findings as advisory.[31] The judge ruled correctly on two threshold questions governing the applicability of the statute: the arrangements between Linkage and Boston University did not involve an intra-enterprise dispute, and Boston University was engaged in trade or commerce in its arrangement with Linkage. We also agree that Boston University's conduct violated G. L. c. 93A. Our conclusions concerning the jury's findings, however, have disturbed the bases on which the judge founded his calculation of damages under G. L. c. 93A,[32] so that a new judgment has to be entered on damages.

(a) *Applicability of G. L. c. 93A.* The applicability of G. L. c. 93A, §§ 2 (*a*) and 11, to interactions between two parties requires a dual inquiry: first, the court assesses whether the interaction is "commercial" in nature, and second, it evalu-

the statements conveyed a message to those employees that Linkage had been involved in serious wrongdoing. The jury would not have been warranted in finding that statements made by Silber to the Boston Globe were defamatory.

[31]Boston University argues that the judge erred in electing to treat the jury's G. L. c. 93A decision as advisory. The judge initially stated that "the jury [will] decide the [c.] 93A claim[s]," but chose after trial to issue his own findings in order to avoid a retrial if one of his key jury instructions was found to be erroneous. The judge's decision to treat the jury verdict as advisory was within his prerogative. See *International Totalizing Sys., Inc.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 435-436 (1990); *Acushnet Fed. Credit Union* v. *Roderick*, 26 Mass. App. Ct. 604, 606 (1988).

[32]As damages under G. L. c. 93A, the judge doubled the jury's award of damages in favor of Linkage on its claims for promissory estoppel, tortious interference, and defamation, and also allowed out-of-pocket damages on its claim for breach of the renewal agreement.

ates whether the parties were both engaged in "trade or commerce," and therefore acting in a "business context." "[Chapter 93A, § 11] requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce. Once it has been established that a commercial transaction exists, then [the court] address[es] whether the individuals were acting in a 'business context' and appl[ies] the test discussed in *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980)." *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995).

(i) *Commercial transaction.* There is ample support in the record for the judge's conclusion that the interaction between Boston University and Linkage was not intra-enterprise but instead was a "commercial transaction" for the purposes of G. L. c. 93A. See *Szalla* v. *Locke, supra.*[33] The arrangement between Linkage and Boston University was an arm's-length transaction between two corporations under which Linkage provided services to Boston University and received compensation. Both the base and renewal agreements state that Linkage is "an independent contractor . . . not an agent or employee of the University," indicating that, from the very beginning of their relationship, the parties did not intend to be treated as partners or participants in a joint venture. We conclude that the relationship between the parties was of a commercial nature for the purposes of G. L. c. 93A.

(ii) *Trade or commerce.* Boston University was engaged in "trade or commerce" in its operation of BUCEC. An entity's "status as a 'charitable' corporation is not, in and of itself, dispositive of the issue whether c. 93A applies."[34] *Planned Parenthood Fed'n of Am., Inc.* v. *Problem Pregnancy of*

---

[33]General Laws c. 93A is not available to parties in a strictly private transaction, where the undertaking is not "in the ordinary course of a trade or business." *Lantner* v. *Carson*, 374 Mass. 606, 608 (1978). We have limited the reach of G. L. c. 93A, § 11, to exclude intra-enterprise disputes because they are more similar to purely private disputes and are not "commercial transaction[s] . . . in the sense required by c. 93A." *Szalla* v. *Locke*, 421 Mass. 448, 452 (1995). See *Manning* v. *Zuckerman*, 388 Mass. 8, 14 (1983). Included in this "intra-enterprise" classification are disputes stemming from an employment relationship, disputes between individual members of a partnership arising from partnership business, and transactions and disputes between parties to a joint venture and between fellow shareholders. *Szalla, supra* at 451, and cases cited.

[34]Nonprofit corporations have sued and been sued under G. L. c. 93A, see, e.g., *Massachusetts Farm Bur. Fed'n, Inc.* v. *Blue Cross of Mass., Inc.,*

*Worcester, Inc.,* 398 Mass. 480, 492-493 (1986). General Laws
c. 93A, § 11, applies to *any "person* who engages in the
conduct of any trade or commerce," as defined in G. L. c. 93A,
§ 1 (*b*) (emphasis added). This section provides that "[t]rade"
and "commerce" include "the sale, rent, lease or distribution of
*any services* and *any property*" (emphasis added). Under the
broad sweep of this language, each case requires examination of
its own circumstances to determine whether it arose in a "busi-
ness context." *Planned Parenthood Fed'n, supra* at 493, citing
*Begelfer, supra* at 190. Application of the *Begelfer* "business
context" test requires "assess[ing] the nature of the transaction,
the character of the parties involved, and the activities engaged
in by the parties . . . . Other relevant factors are whether
similar transactions have been undertaken in the past, whether
the transaction is motivated by business or personal reasons
. . . and whether the participant played an active part in the
transaction." *Begelfer, supra* at 191.

We agree with the judge that, in the particular circumstances
of this case, Boston University was engaged in "trade or com-
merce." Boston University's management of BUCEC, and its
contractual relationship with Linkage, do not share the
characteristics of activities engaged in by other private
nonprofit entities that have been determined not to have been
engaged in "trade or commerce" under G. L. c. 93A. See
*Poznik* v. *Massachusetts Medical Professional Ins. Ass'n,* 417
Mass. 48, 52-53 (1994) (defendant was " 'statutorily mandated
nonprofit' association" whose transactions were "motivated by
legislative mandate, not business or personal reasons" and
therefore not engaged in trade or commerce); *Barrett* v. *Mas-*

403 Mass. 722 (1989); *Charles River Mtge. Co.* v. *Baptist Home of Mass.,
Inc.,* 36 Mass. App. Ct. 277 (1994), and have been held liable under the
statute, see *Miller* v. *Risk Mgt. Found. of the Harvard Med. Insts., Inc.,* 36
Mass. App. Ct. 411 (1994). We have, however, occasionally declined to apply
G. L. c. 93A to situations in which a nonprofit organization has not sought to
profit from its transaction with the plaintiff. See *All Seasons Servs., Inc.* v.
*Commissioner of Health & Hosps. of Boston,* 416 Mass. 269, 271 (1993)
(statute not applicable where hospital did not seek to profit from contract with
food service company and providing food services was incidental to hospital's
primary activity); *Hubert* v. *Melrose-Wakefield Hosp. Ass'n,* 40 Mass. App. Ct.
172 (1996) (hospital not subject to G. L. c. 93A because it was not acting in
business context to generate profit through its efforts to relocate building in
order to expand onto building's prior location).

*sachusetts Insurers Insolvency Fund*, 412 Mass. 774, 776, 777 (1992) (same); *Planned Parenthood Fed'n, supra* at 493-494 (where employees and incorporators of charitable entity were advocates for pro-life position and entity did not charge for its services, trademark infringement claim was beyond scope of c. 93A). In its management of BUCEC, Boston University did not operate under any legislative constraints, and corporations, participants, and others were charged fees for the services offered by Linkage and BUCEC.

The university was also actively involved in all aspects of the arrangement. The original understanding between the parties contemplated a continuing relationship between Linkage and Boston University of up to six years' duration. The relationship did not involve anything that could be said to be purely incidental to the university's educational mission, as might be a contract for services or equipment. Compare *All Seasons Servs., Inc.* v. *Commissioner of Health & Hosps. of Boston*, 416 Mass. 269, 271 (1993) (hospital did not act in business context where it did not seek to profit from transaction with food service vending company, and entering a contract for food services was incidental to hospital's primary function of providing medical services).

Further, G. L. c. 93A was designed "to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices." *Poznik, supra* at 53, citing *Manning* v. *Zuckerman*, 388 Mass. 8, 12 (1983). Although by definition, a qualified nonprofit corporation does not earn a "profit" from its activities, such a corporation need not be profitmaking in order to profit from an activity.[35] While Boston University's status required that it remain a nonprofit corporation, it nonetheless was motivated by a strong desire to benefit as much as possible from its arrangement with Linkage, as a means of dealing with the debt service and costs of the Wang facility. As the judge observed: "Boston University entered and maintained its contractual relationship with Linkage . . . to engage in trade and commerce by having [Boston University] expand its reach . . . to the corporate market [which] provided a . . . lucrative earnings potential . . . ." Linkage's ability to "add value" to the enterprise was clearly a determining factor in Silber's decision

---

[35]Our use of the term "profit" here is meant colloquially, in the sense of revenues that exceed expenses.

to terminate the base agreement and repudiate the renewal agreement. As a result of eliminating the middleman, Boston University expected to increase its revenues from the programs that Linkage had developed. By creating a pretext to justify terminating the base agreement, denying the existence of the renewal agreement, and then hiring Linkage's employees in contravention of a contractual prohibition, Silber and Boston University were seeking to "profit from unfair practices." *Poznik*, *supra* at 53. See *Planned Parenthood Fed'n*, *supra* at 499 (Abrams, J., concurring in part and dissenting in part) (defendant charitable corporation operated in a "business context" where it engaged in competitive marketplace "activities . . . designed to damage or destroy its competitor").[36]

In reaching this conclusion, we emphasize the fact-specific nature of the inquiry. In most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission. But when, as is the case here, an institution's business motivations, in combination with the nature of the transaction and the activities of the parties, establish a "business context" as contemplated in *Begelfer*, G. L. c. 93A will apply because the

---

[36]The judge's conclusion that Boston University was involved in trade or commerce was based in part on his impression that the programs and offerings taught at BUCEC were "non-educational" because they were vocational in nature and taught to nontraditional students. This impression is incorrect. We have given broad meaning to the term "education" in order to implement legislative goals and to allow education reasonable freedom to develop, and we have held that vocational and technical teaching and courses constitute education. See, e.g., *Assessors of Boston* v. *Garland Sch. of Home Making*, 296 Mass. 378, 386 (1937) (instruction in homemaking skills is educational); *Mount Hermon Boys' Sch.* v. *Gill*, 145 Mass. 139, 146, 149 (1887) (for purposes of statute exempting educational property from taxation, education includes teaching practical skills). As Justice Knowlton phrased the concept of education, "according to one of Webster's definitions," in the *Mount Hermon* decision, "[t]o educate . . . is 'to prepare and fit for any calling or business, or for activity and usefulness in life.' " *Id.* at 146. Some of the programs offered at BUCEC through Linkage were comparable to academic courses taught in the engineering, computer science, and business administration curricula at Boston University's main campus and were clearly educational. Even though many of the courses were vocational or technical in nature and were taught at a satellite facility, they were also educational in nature. The judge's erroneous impression on this point, however, does not disturb our conclusion that the interaction between the parties occurred in a business context.

institution has inserted itself into the marketplace in a way that makes it only proper that it be subject to rules of ethical behavior and fair play.

(b) *Violation of G. L. c. 93A.* The judge was warranted in finding that Boston University's actions constituted unfair or deceptive practices, and that they constituted wilful and knowing violations of the statute. A practice is unfair if it is "within . . . the penumbra of some common-law, statutory, or other established concept of unfairness; . . . is immoral, unethical, oppressive, or unscrupulous; [and] . . . causes substantial injury to [other businessmen]." *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). The judge was warranted in finding that Boston University's actions in the months leading up to, and after, the termination were unethical and unscrupulous, and Silber's and Westling's conduct, in particular, was unfair, oppressive, and deceptive. The university, and its principals, repudiated binding agreements and usurped Linkage's business and work force in order to promote a purely self-serving agenda. The result was to end Linkage's vitality as a going concern, at least until it might be able to reconstitute itself with its main mission still intact. In this critical aspect, the judge (and the jury before him) faced the nettlesome question of which side of the dispute to believe. In the final analysis, the matter presented a credibility choice, resolved by the fact finders squarely in favor of Linkage. This result, at the appellate level, is uncontestable in the absence of clear error of fact or law, which has not been made to appear.

(c) *Damages under G. L. c. 93A are not capped.* The $20,000 limitation on damages against charitable entities for tort liability, contained in G. L. c. 231, § 85K, does not apply to liability under G. L. c. 93A, which creates an independent statutory basis of liability. General Laws c. 93A creates "broad new rights, forbidding conduct not previously unlawful under the common law of contract and tort or under any prior statute." *Dodd* v. *Commercial Union Ins. Co.*, 373 Mass. 72, 78 (1977). A determination that conduct is unfair or deceptive is not dependent on traditional tort or contract theories and represents a finding under a statute that creates new substantive rights. *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 626 (1978). *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975). See *Miller* v. *Risk Mgmt. Found. of*

*the Harvard Medical Insts., Inc.*, 36 Mass. App. Ct. 411, 417 n.9 (1994) (rejecting argument that G. L. c. 231, § 85K, applied to cap a G. L. c. 93A recovery against a charitable corporation; characterizing the argument as "[q]uite anomalous").[37]

6. *Linkage's recovery.* We now sum up the recovery that Linkage is entitled to. Under the jury's finding that Boston University violated a binding renewal agreement, Linkage should recover damages of $2,411,852 with interest ($2,148,000 for three years of lost profits plus out-of-pocket expenses of $338,098 less the $74,246 credit due Boston University for its out-of-pocket expenses).[38] Linkage cannot

---

[37]Under G. L. c. 231, § 85K, a charitable entity is liable for a maximum of $20,000 in tort damages so long as its activities are in service of its core charitable mission and not "primarily commercial," language that apparently stemmed from the holdings of *Holder* v. *Massachusetts Horticultural Soc'y*, 211 Mass. 370, 373 (1912), and *McKay* v. *Morgan Memorial Coop. Indus. & Stores, Inc.*, 272 Mass. 121, 124 (1930).

It is suggested that, because Boston University's activities at BUCEC and its contractual relationship with Linkage were in service of its core educational mission and therefore not "primarily commercial," this is irreconcilable with a conclusion that such activities constitute "trade or commerce" under G. L. c. 93A.

These two conclusions are not in conflict. The two statutes serve different purposes, and their standards are quite distinct. The "commercial transaction" threshold is passed under G. L. c. 93A if the parties to the dispute are not parties in the same venture; the "trade or commerce" test is passed if the parties and their interaction meet the factor analysis in *Begelfer* v. *Najarian*, 381 Mass. 177, 190-191 (1980). *Szalla* v. *Locke*, 421 Mass. 448, 451-452 (1995). The applicable test under G. L. c. 231, § 85K, however, is a completely different inquiry: the exception in the statute, rendering a charitable corporation liable for tort damages only where the corporation's activities are "primarily commercial in character," requires commercial activity that is "entirely disconnected" from the defendant's charitable purpose. See *Holder* v. *Massachusetts Horticultural Soc'y, supra.* The "commercial" and "trade or commerce" standards of G. L. c. 93A are entirely independent inquiries from the "primarily commercial" test of G. L. c. 231, § 85K, and are not reliant on a determination whether the undertaken activity serves the institution's primary charitable purpose. A charitable entity can engage in activities that are in service of its core charitable mission and still fall under the governance of G. L. c. 93A.

[38]We reject Boston University's argument that the damages awarded on this claim lacked foundation in the evidence. The jury's award of lost profits was sufficiently supported by the evidence presented at trial, in the form of exhibits and through testimony from Harkins and from Larry Carr, Linkage's chief financial officer. The jury relied on projections of

recover damages for Boston University's violation of the no-hire provisions of the agreements. Linkage is not entitled to recover the lost profits damages awarded by the jury on the promissory estoppel claim or the damages awarded by them on the claims asserting breach of the covenant of good faith and fair dealing and defamation. We agree with the judge's findings that the conduct of Boston University officials was violative of G. L. c. 93A and was wilful or knowing, so that the damages set forth above are to be doubled under the punitive damages provision of G. L. c. 93A, § 11.[39] Finally, under G. L. c. 93A, Linkage is entitled to recover its attorney's fees and costs. The award made by the judge for trial services and expenses by Linkage's attorneys in the amount of $899,382.04 is supported by the record made on the issue of attorney's fees and costs. Additionally, Linkage may apply to a single justice for an award of appellate attorney's fees and costs. See *Yorke Mgt.* v. *Castro*, 406 Mass. 17, 20 (1989).

7. *Disposition.* It will be easier to vacate the existing judgments and to have the judge then enter a single judgment in keeping with the conclusions reached in this opinion. The judgment entered on March 28, 1995, and the supplemental

future performance based on Linkage's past performance. The use of such estimates is acceptable so long as the evidence affords a "basis for a reasonable judgment." *Galvin* v. *Nutting-Pillman Amusement Co.*, 284 Mass. 314, 315 (1933). The jury apparently based their award of $2,148,000 for lost profits by taking Carr's estimate that Linkage would have earned $716,000 during the first calendar year of the renewal agreement, and multiplying that figure by the three years of the renewal agreement. This was, if anything, a conservative approach, considering the rapid growth in revenues during the first three years of the base agreement and the ambitious plans to expand programs both at the BUCEC site and in other cities. The damages were calculated under correct instructions of law, and the award of lost profits satisfied the principles set forth in *Lowrie* v. *Castle*, 225 Mass. 37, 51-52 (1916). See *Augat, Inc.* v. *Aegis, Inc.*, 417 Mass. 484, 488 (1994). The jury's award of out-of-pocket damages was likewise sufficiently grounded in the evidence. A detailed breakdown of these expenses was prepared by the jury and included with their answers to special questions.

We mention briefly one other issue as to the lost profit damages. The judge found in his G. L. c. 93A decision that Linkage's compensation for the second and third years of the renewed agreement was open to negotiation. The evidence does not support this finding, but rather supports the jury's findings on damages outlined above.

[39]Because this G. L. c. 93A award is the more favorable award to Linkage, the jury's award of $1,250,000 in damages for Boston University's violation of G. L. c. 93A is to be disregarded.

judgment entered on April 12, 1995, are vacated. The order granting Boston University judgment notwithstanding the verdict on the jury's findings that a renewed agreement was in effect and had been violated is vacated, and the jury's findings on that claim are reinstated. A new judgment is to enter awarding Linkage damages, together with attorney's fees, costs, and interest, in accordance with this opinion, particularly Part 6. The order denying Boston University's motion for a new trial is affirmed.

*So ordered.*